UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RAQUEL CARMON,                          )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )        Case No. 4:19-CV-02855-AGF
                                        )
SAKS FIFTH AVENUE, LLC,                 )
                                        )
                Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court on the cross motions (ECF No. 49 & 52) for

summary judgment filed by Plaintiff Raquel Carmon[1] and Defendant Saks Fifth Avenue,

LLC ("Saks"), with respect to Carmon's claims asserting race discrimination, hostile

work environment, and  retaliation in violation of the Missouri Human Rights Act

("MHRA"), Mo. Rev. Stat. §§ 213.010-213.137.  For the reasons set forth below, the

Court will grant Saks' motion and deny Carmon's motion.

## BACKGROUND

For the purpose of the motions before the Court, the record establishes the

following facts.[2]  Carmon is an African American female.  Prior to her employment with

---

[1]        Carmon's motion is addressed to all issues except damages.

[2]        The parties' statements of uncontroverted material facts and responses thereto are
lengthy, with Plaintiff asserting 415 statements of fact (ECF No. 54), and 335 additional
statements of facts (ECF No. 64-1).  The Court will only discuss those facts that are
relevant to the Court's analysis.

Saks, Carmon held various retail manager positions, including managerial positions at clothing retail stores that involved supervising direct reports, as well as an asset protection management position at a hardware store in which she did not supervise any direct reports.  ECF No. 62 at ¶¶ 2-6, ECF No. 64-1 at ¶¶ 11-12.  Saks hired Carmon on November 20, 2015 as one of two asset protection investigators assigned to Saks' Frontenac, Missouri store.  Throughout her employment at Saks, Carmon worked under the direct supervision of Nate Dickey, a white male and a district asset protection manager ("DAPM"), charged with overseeing asset protection functions at the Frontenac store and at a Saks Off Fifth store location in Chesterfield, Missouri.  Dickey was involved in the decision to hire Carmon. ECF No. 64-1 at ¶ 13.

In her first year and a half of employment, Carmon received positive performance evaluations.  Specifically, on May 4, 2016, Dickey gave Carmon an annual performance evaluation rating her "at target," which is considered a positive evaluation by Saks and typical of most employees.  ECF No. 62 at ¶¶ 226-32, ECF No. 64-1 at ¶ 15.  Throughout Carmon's employment at Saks, Saks had a step-based employee discipline policy that included issuing the employee a written warning as part of a performance improvement plan before terminating the employee.  ECF No. 62 at ¶ 250.

**Carmon's Applications for Promotion in 2016 and 2017**

In October of 2016, Carmon applied for a position as a retail selling manager. ECF No. 64-1 at ¶¶ 16-17.  Saks does not have any written policies regarding promotions.  ECF No. 62 at ¶75.  However, Carmon asked Marie Plufka, a white female and the human resources director for the Frontenac store at that time, about the selling

3

manager position.  ECF No. 62 at ¶ 57.  As the human resources director, Plufka was responsible for facilitating the investigation of allegations of discrimination, harassment, or retaliation, but Plufka did not receive any training from Saks on federal or state anti-discrimination or anti-retaliation laws.  ECF No. 62 at ¶¶ 58-59.

Plufka told Carmon that she should go through an internal recruiter with respect to her application.  ECF No. 62 at ¶ 95.  However, a former store manager informed Carmon in October of 2016 that the manager had not gone through a recruiter when she was selected for her managerial position.  ECF No. 62 at ¶ 97; ECF No. 54-7, Carmon dep. 70:9-24, 77:15-78:17.

Plufka further told Carmon that Carmon was not Saks material, that Carmon would be better suited at Saks Off Fifth,[3] and that Carmon should apply for jobs in a more diverse market, where people were more like her.  ECF No. 62 at ¶¶ 92, 100.  Carmon does not allege the date on which these conversations with Plufka took place.  *Id.*  Saks ultimately hired a white selling manager from another department to fill the position.  ECF No. 64-1 at ¶ 18; ECF No. 74, PSUMF at ¶ 21.

In April of 2017, Carmon applied for a DAPM position at Saks' Chicago location.  ECF No. 64-1 at ¶ 19.  Saks' regional director of asset protection, John Evans, scheduled Carmon for an interview for this position but later canceled the interview because he believed she was not qualified for the position.  ECF No. 62 at ¶¶ 77-81.  Saks awarded

---

[3]     Saks full-line stores, such as the Frontenac store, sell more higher-end merchandise than Saks Off Fifth.  ECF No. 62 at ¶ 94.

the Chicago DAPM position to two white individuals with multi-store experience in a

DAPM role, which Carmon lacked.[4]   ECF No. 64-1 at ¶ 21.

Dickey told Carmon "not to hold her breath on getting promoted" and encouraged

Carmon to apply for a less demanding asset protection manager ("APM") position in

Sarasota, Florida, to gain experience, but Carmon refused because she felt the location

was too small.   ECF No. 62 at ¶ 72; ECF No. 64-1 at ¶ 26.   Dickey also told Carmon on

various occasions and alluded throughout her employment that he felt there was racism at

the Frontenac store, including among members of management.   ECF No. 62 at ¶¶ 20-33.

Dickey further commented to Carmon during the summer of 2017 that he respected a

black janitor at the store for riding the bus to work rather than selling drugs, which

Carmon felt disparaged the janitor based on his race.   *Id.* at ¶ 26, ECF No. 64-1 at ¶ 90.

On May 1, 2017, Dickey gave Carmon another annual performance evaluation

again rating her "at target."   ECF No. 62 at ¶ 228.   Carmon alleges she applied for two

additional DAPM positions in August and October of 2017, respectively, but Saks does

not have a record of such application.   ECF No. 64-1 at ¶ 23.   There is no evidence

regarding whether these positions existed or were filled by any other candidate.

Carmon recalled that the assistant general manager of operations at the Frontenac

store, Debra Derrick, told Carmon that she (Derrick) would create a list of tasks for

Carmon to complete in order to receive a promotion.   ECF No. 62 at ¶ 87.   Carmon does

---

[4]      One of these individuals had previously worked as a DAPM for a Saks-related
entity, Lord & Taylor, and according to Carmon, Lord & Taylor hired that individual as a
DAPM notwithstanding her lack of prior experience at that time.

not allege when this conversation took place.  *See id.*  However, Dickey did not recall anyone else having to complete a list of tasks before receiving a promotion, and Derrick did not provide Carmon with any such list before Derrick retired from Saks in or about October 2017.  *Id.*; ECF No. 54-8, Carmon dep. 344:22-345:22.  Carmon stopped applying for promotions at Saks in October of 2017, because she felt discouraged and that she was denied opportunities because of her race.  ECF No. 62 at ¶¶ 110-111.

**Carmon's July 16, 2017 Anonymous Letter Regarding Racism at Frontenac Store**

After June of 2017, Plufka was no longer employed by Saks.  ECF No. 74, PSUMF at ¶ 28.  On July 16, 2017, Carmon wrote an anonymous letter addressing racism at the Frontenac store.  *See* ECF No. 64-15, Pl.'s Ex. 9.  The letter purported to be from a store manager and alleged that the manager had heard members of management "refer to employees as idiots, stupid, incompetent, not smart enough, fairies and n[*]ggers," "say minorities (African Americans) and those who associate with minorities lack polish and refinement," and "say that African Americans are fortunate to be allowed to work at Saks Fifth Avenue and they should know their place as servants in the store."  *Id.*

Carmon mailed and hand-delivered the anonymous letter to certain store employees.  ECF No. 74, PSUMF at ¶ 67.  Saks did not learn that Carmon wrote the letter until years later, after Carmon filed this lawsuit.  But as discussed below, Dickey and possibly others at Saks suspected Carmon's involvement in writing the letter as early as February of 2018.  ECF No. 64-32 at 2.

Saks' corporate human resources department in New York received a copy of the anonymous letter sometime in July of 2017, at which time Derrick Wells, Saks'

6

divisional vice president of human resources for the Northeast and Midwest regions,

traveled to the Frontenac store to investigate the letter's allegations.  ECF No. 64-1 at ¶ 6;

ECF No. 74, PSUMF at ¶¶ 70-71.  Wells interviewed several Frontenac store employees

as part of his investigation.   ECF No. 74, PSUMF at ¶ 71.

At the conclusion of investigation, Wells found that, at the Saks Frontenac store,

there had been racially insensitive comments, poor leadership in the store, issues with the

store dress code, and a lack of professionalism on the part of some of the managers.  *Id.*,

PSUMF at ¶ 87.  For example, Wells received reports from employees that a store

manager, Robert Williamson, had stated or suggested on various occasions that it was a

"great day in America to be a white man" after Donald Trump was elected president, that

Muslims should be banned from this country because so many are terrorists, that he

should be allowed to "could use the word N[*]gger since its ok for Black people to do

so," and that a black employee may be eating fried chicken and watermelon for dinner.

*See id.*, PSUMF at ¶¶ 76-77, 84-85.  Wells also received employee reports that Plufka—

who by the time of Wells's investigation was no longer employed by Saks—made

comments that larger associates should not wear revealing clothing or sleeveless tops,

and that a store manager named Melissa Bock had made inappropriate comments about

Asian customers.  *Id.*, PSUMF at ¶ 82; ECF No. 54-2, Wells dep. 100:1-102:6.  There is

no evidence or allegation that any of the above-noted comments was directed to Carmon.

Wells received some information regarding his investigation, including

information about Bock's conduct, from a white Frontenac store employee, Sarah Weis.

In her deposition in this case, Weis recalled that Bock had also questioned Carmon's

7

qualifications for her job in asset protection and made comments insinuating that Carmon was incompetent or not intelligent.  ECF No. 62 at ¶ 38.  Weis believed Bock's comments were related to Carmon's race even though they did not reference race.  *Id.* at ¶ 39.  Weis also recalled Bock describing African Americans generally in derogatory terms and racially profiling African American customers.  ECF No. 74, PSUMF at ¶¶ 24-26.

As a result of Wells's investigation, Saks placed Williamson on final written warning, counseled Bock, and implemented diversity and inclusion training.  *Id.*, PSUMF at ¶¶ 75-76, 93-94 & 98; ECF NO. 62 at ¶ 160; ECF No. 54-2, Wells dep. 94:2-96:3, 104:1-24.  Bock was later placed on a final written warning and ultimately terminated in January of 2018.  ECF No. 62 at ¶¶ 199-200.  There is no evidence that either Bock or Williamson supervised Carmon or was involved in any decisions related to Carmon's employment.

According to Carmon, after she delivered her anonymous letter and Wells conducted his investigation in July of 2017, "[r]ace-based discrimination took a reprieve of a little over 180 days at Saks' Frontenac store."  ECF No. 64 at 9.  In October of 2017, Kimberly Hawley became the assistant general manager of operations at the Frontenac store, replacing Debra Derrick.  ECF No. 64-1 at ¶ 8.

**Carmon's Alleged Performance Deficiencies and Written Warning in 2018**

On October 12, 2017, Dickey was placed on a final written warning by his supervisor, Evans, regarding deficiencies in Dickey's managerial performance.  ECF No. 64-1 at ¶ 29.  Around the same time, October of 2017, Dickey claims that he was told by Detective Mike Barron, a Frontenac police officer who also worked "secondary duty" in

8

loss prevention at the Saks Frontenac store, that Carmon was periodically late in submitting shoplifting reports.  Detective Barron worked secondary duty at the Frontenac store for the entire period of Carmon's employment with Saks.  ECF No. 62 ¶ 337.

Detective Barron testified in a deposition in this case that, although Carmon was thorough and fair in her work, Carmon was the only loss prevention employee at Saks who submitted late reports, and Barron had to follow up with Dickey a few times to get Carmon's reports returned in a timely manner.  ECF No. 54-4, Barron dep. 23:6-25.  As a result of this issue, Dickey had a conversation with Carmon regarding her failure to follow through, and Carmon acknowledged that she had not timely provided Detective Barron with required paperwork.  ECF No. 64-1 at ¶ 32.  Dickey also testified by deposition in this case that, around this time, he was cautioned by the Frontenac store's general manager, Ryan Jay, to start holding Carmon accountable for deficiencies in her work performance and that Dickey thereafter began documenting Carmon's performance issues.  *Id.* at ¶ 33.

On January 29, 2018, Dickey emailed Carmon and the other asset protection investigator employed at the Frontenac store at the time to remind them of proper closing procedures.  ECF No. 51-9 at 2.  On February 1, 2018, Dickey sent another email to Carmon stating that closing procedures must be completed nightly.  *Id.* at 5.

On February 9, 2018, Carmon emailed Dickey stating that other employees told her that she had a "target on [her]" and was having performance issues.  ECF No. 64-32 at 1.  Carmon stated that she felt "blindsided" by these comments because she was not aware of major performance issues and because her purported performance issues were

being shared with other employees.  *Id.*  This email did not mention or allude to discrimination based on Carmon's race.  *See id.*

On February 19, 2018, Dickey forwarded Carmon's email to Phoebe Vasconcellos, Saks' regional human resources manager.  *Id.* at 2.  Dickey stated that he had been having numerous performance improvement discussions with Carmon and believed that Carmon's email "was an attempt to discredit [his] previous conversations with her and make it seem that 'we are forcing her out,' as [Carmon] has put it."  *Id.*  Dickey further stated: "Just for your information, we always thought [Carmon] may have been behind the letter our store received last July."  *Id.*  Dickey concluded by suggesting that he believed Carmon had in the past attempted to divert attention from her performance issues by making complaints about others, and Dickey asked Vasconcellos what Saks' options were with respect to Carmon.  *Id.* at 3.

In response, on February 20, 2018, Vasconcellos requested more information on Carmon's performance issues and stated that they could look at putting Carmon on a performance improvement plan.  *Id.* at 2.  Later that day, Vasconcellos also emailed Carmon about her concern that Dickey was sharing her personnel information, and asked her for more information, including the names of the employees who approached her about her performance.  *Id.* at 4.   Vasconcellos emailed Dickey later that day, indicating that there was no issue with respect to Carmon's complaint because "[Carmon] backtracked her statements."  *Id.* at 5; *see also* ECF No. 64-1 at ¶ 164.  It is not clear from the record what conversations, if any, Carmon had with Vasconcellos regarding her complaint about the sharing of her performance issues with other employees.

On February 22, 2018, Dickey sent another email to Vasconcellos detailing Carmon's performance issues, which according to Dickey, had begun around May of 2017.  ECF No. 51-10 at 3.  Dickey listed examples of Carmon's performance issues, including not complying with proper closing procedures and not filing proper paperwork. *Id.* at 2.  Dickey also referenced his emails to Carmon, discussed above, and noted Carmon's response that she believed she had a "target on her back."  *Id.*  Dickey stated that he had to be careful around Carmon and document everything in emails because she did not accept feedback well.  Dickey further stated: "When [Carmon] discusses going to concerts or events with me, she almost always says 'they discriminated against me because I am a lesbian with mixed heritage.'  I am worried she may try to use that here." *Id.* at 3.  Dickey concluded by stating that he "just need[ed] [Carmon] to perform, accept accountability, and fix her issues."  *Id.*

Sometime in February of 2018, Saks' Frontenac store terminated another African American employee, Shabriel Sims, with the explanation that the store was eliminating part-time positions.[5]  Weis, the white employee who had supplied Wells with information during his investigation of racism at the Frontenac store, quit her job in March of 2018 because she was denied paid time off.  ECF No. 74, PSUMF at ¶ 111.  According to Carmon, this amounted to a retaliatory constructive discharge of Weis.  *Id.*

---

[5]    Sims testified by deposition in this case that she believed that after she was terminated, a white employee was permitted to continue to work part time.  But Sims based this belief solely on inadmissible hearsay, namely, what she was told by other people. *See, e.g.*, ECF No, 54-11 at pp. 82-83.

On March 19, 2018, Dickey again emailed Vasconcelos regarding Carmon's performance issues, and he forwarded the email to Hawley, the Frontenac store's assistant general manager of operations.  ECF No. 51-11 at 2.  Dickey listed examples of Carmon's performance issues, such as Carmon's performing an override of a gate alarm without waiting to get Dickey's approval and Carmon's failure to properly account for store keys.  *Id.*  Hawley sent a follow-up email to Vasconcellos on March 20, 2018, stating that she would like to move to a final warning for Carmon because of Carmon's continuing performance issues.  ECF No. 54-20 at 1.  Vasconcellos responded to Hawley's email the same day, agreeing that Carmon should be put on a final warning but stating that she did not "think this instance [was] enough to term[inate]" Carmon's employment.  *Id.*

On March 27, 2018, Dickey emailed Hawley regarding his team's annual performance evaluations.  ECF No. 54-32 at 1.  As to Carmon's performance evaluation, Dickey stated that he was told the prior year by Plufka, the former human resources director, that in order "to rate [Carmon] [below target], we needed documentation throughout the year," and that "[a]side from Q4 conversations, [Dickey did not] have any documents against [Carmon]" for the past year.  *Id.* at 2.  Dickey stated that his "fear" was that if he gave Carmon a "below target" instead of "on target" rating, she would challenge the rating and human resources might reverse it, giving Carmon "a false sense of security."  *Id.*  Dickey then asked for Hawley's thoughts.  *Id.*

Hawley responded the same day by stating: "Don't you think we should do below target considering she's going on to a final? If we put on target the[n] why are we

12

documenting her? Long term here we want to let her go and replace so I think we should be consistent. That's just me. I will put what you want, you let me know." *Id.* at 4. Dickey immediately responded that he was "absolutely down" for a "below target" rating, and he noted that he tried to give Carmon a "below target" rating the previous year and was told "no, because we didn't have enough documentation." *Id.* at 7.

On March 29, 2018, Dickey placed Carmon on a final written warning, copying Vasconcellos.  ECF No. 54-20 at 5.  The final written warning listed examples of Carmon's performance deficiencies such as failing to lower a security gate and failing to file required paperwork in February of 2018, and overriding an alarm without permission and failing to comply with proper closing procedures in March of 2018.  *Id.* at 5.

On April 13, 2018, Dickey discussed the possibility of a Veiled Prophet event being hosted at the Frontenac store.  Some store employees felt uncomfortable with the event, believing the Veiled Prophet to be a racist organization.  Carmon told Dickey that she did not want to work at the event, and Dickey thereafter did not require her to work the event.  ECF No 74, PSUMF at ¶¶ 126-131.

**Carmon's April 17, 2018 Complaint of Discrimination Against Dickey and Saks**

On April 17, 2018, Carmon sent a letter to Vasconcellos and Evans, asserting a formal complaint against Saks and Dickey for providing a hostile work environment, sexual discrimination, racial discrimination, and defamation of character.  ECF No. 54-21, Pl.'s Ex. 23, at 1-2.  In the letter, Carmon detailed numerous complaints about Dickey, including that Dickey told her about prejudice at Saks, told her that she was not getting promoted due to the color of her skin, viewed her as African American despite her

13

multi-racial heritage, rejected her requests for a mentor and to join a management program that she believed to be required to be promoted, told her not to hold her breath on getting promoted, directed her to look for employment outside of Saks, and told her that she would not work at the store's Veiled Prophet event due to the racial undertones of the event. *Id.* at 2-5.

In support of her hostile work environment allegation, Carmon explained that she was given a final written warning for deficiencies that she disagreed with, and Carmon explained the basis for disagreement.  Carmon also described Dickey's failure to address performance issues with her before issuing her the final written warning and alleged that her March 30, 2018 performance evaluation was supposed to reflect her performance for the 2017 fiscal year, which ended on February 3, 2018, but instead, it was mostly comprised of events that occurred during the 2018 fiscal year. *Id.* at 5-9.  Carmon asked Saks to investigate her complaints and to remove the final written warning from her record. *Id.* at 9.

Vasconcellos, under the direction of her manager, Bernadette Noland, thereafter began investigating Carmon's complaints, including by interviewing Carmon and other employees.  ECF No. 64-1 at ¶ 50.  Dickey was made aware of Carmon's formal complaint against him.  In late April of 2018, Vasconcellos concluded that there was no evidence to substantiate that Dickey violated any Saks policy, and Vasconcellos informed Carmon of this conclusion. *Id.*  at ¶¶ 52-53.

On April 30, 2018, Vasconcellos set up a call with Hawley and Dickey, at the request of Noland, to discuss Carmon's final written warning and how to proceed with

14

respect to Carmon's performance issues.  *See* ECF No. 54-39, Pl.'s Ex. 59.  On May 4, 2018, Carmon emailed Vasconcellos stating that, since she submitted her complaint against Dickey, he had become increasingly hostile toward her and falsely accused her of performance issues.  *See* ECF No. 54-25, Pl.'s Ex. 48.

### Carmon's Taking of Merchandise in June of 2018 and Subsequent Termination

On June 4, 2018, Dickey directed Carmon to take three items of customer-owned merchandise ("COM") located in the asset protection office to donate the items to charity. It is not clear from the record what these items were or how much they were worth.

Pursuant to Saks' COM policy at that time, which Dickey had distributed by email to Carmon and other employees approximately four months earlier, COM is "any merchandise that we can identify as belonging to a particular customer through a receipt or otherwise, as well as alterations merchandise."  ECF No. 51-23 at 2.  "Customer owned merchandise includes merchandise a customer purchased at Saks Fifth Avenue and does not take out of the store, merchandise a customer purchased at another retailer and leaves behind at Saks Fifth Avenue, and merchandise a customer leaves at Saks Fifth Avenue for the purpose of coordinating with other items."  *Id.* at 3.

The policy as described in Dickey's email stated that COM could be held for two weeks and was then tagged with color COM paperwork and logged by asset protection in a COM logbook listing the customer's name and contact information.  *Id.* at 3-4.  The associate or manager was then required to attempt to contact the customer three times by telephone, documenting such calls; send a follow-up letter with return receipt requested;

15

and if 60 days pass without response, donate the merchandise to a local charitable organization or, if the item could not be donated, dispose of or destroy the item. *Id.* at 4.

The asset protection associate or manager was required to complete a COM donation form recording the day the item was donated, the name and address of the charitable organization, and the name of the individual to whom the item was given. *Id.* The COM donation form was required to be filled out before the COM merchandise left the store. ECF No. 54-12, Kilgallon dep. 33:3-8. However, the policy did not contain any specific time requirement for returning the completed COM donation form to Saks.

According to Carmon, Dickey did not always adhere to this policy, and it is unclear whether he did so with respect to the COM items that he asked Carmon to donate on June 4, 2018. Dickey and Carmon had both previously donated COM items to various charity organizations. Other than COM and lost-and-found items kept for a certain length of time, Saks does not permit donation of merchandise. *See id.*, Kilgallon dep. 24:12-16 & 66:5-9. Saks has other written policies regarding merchandise marked out of stock ("MOOS") and a policy for merchandise considered to be evidence, and these policies do not permit donation. *Id.*, Kilgallon dep. 66:17-69:16.

In early June of 2018, Dickey informed Noland that since Carmon's April 2018 complaint was addressed, Carmon "has been a really strong performer" and that "she may turn it all around." ECF No. 64-1 at ¶ 54.

On June 27, 2018, Detective Barron returned $6,800 in previously stolen Saks merchandise, some of which was owned by Gucci, which operated as an in-store leasing partner within Saks' Frontenac store. The merchandise was not considered COM

16

because it was never paid for or owned by a customer.  Rather, the merchandise had been seized as evidence by the Frontenac police in a criminal case and was no longer needed because the case had concluded.  ECF No. 64-1 at ¶¶ 56-58.  As noted above, Saks had a separate policy with respect to the return of merchandise considered to be evidence, and that policy did not permit the merchandise to be donated.

Prior to returning this merchandise, Detective Barron informed Dickey that he would be returning merchandise from a prior criminal case, but there is no evidence that Barron specified when he would do so.  *Id.* at ¶¶ 56-58; *see also* ECF No. 74, PSUMF at ¶¶ 220-221.

When Detective Barron arrived at the store, Dickey was not present, so Barron gave the merchandise to Carmon.  At the time of transfer, Detective Barron prepared a photographic evidence form and a property release form itemizing the merchandise being returned, which both Barron and Carmon signed.   Detective Barron left a copy of the property release form with Carmon to include in Saks' case history records.  ECF No. 64-1 at ¶¶ 57, 61.  Detective Barren also expressly advised Carmon at the time of transfer that he had spoken with Dickey about returning the merchandise and that Saks wanted to retain the merchandise.  ECF No. 74, PSUMF at ¶ 225.

On July 6, 2018, Detective Barron asked Dickey about the merchandise he had returned to Saks the previous week, on June 27th.  This was the first time that Dickey learned that Detective Barron had returned the merchandise.  ECF No. 51-2, Dickey dep., 186:7- 187:12; ECF No. 51-6, Barron dep. 119:8-120:15.  Dickey attempted to locate the merchandise and return it to inventory, and when he could not find it, he called Carmon

and left her messages asking her where she had placed the merchandise returned by Detective Barron.  Carmon was on approved vacation at the time and therefore did not respond to Dickey's messages.  ECF No. 64-1 at ¶ 65.  Dickey then called Detective Barron to the store in order to review the store's video surveillance footage.  ECF No. 74, PSUMF at ¶ 245.

In the surveillance footage, Dickey and Barron observed Carmon removing the merchandise bags from the store, some of which were identified by Barron as the same ones he had returned on June 27, 2018.  ECF No. 64-1 at ¶ 66.  They also discovered that the exterior surveillance camera was moved so that it would not depict the employee parking lot.  Although they did not observe Carmon moving the camera, they believed that Carmon moved the camera because she had access to the camera as an asset protection investigator.  ECF No. 51-6, Barron dep. 123:24-124:25.  Dickey and Detective Barron searched for but could not locate the property receipt signed by Carmon or any other documentation related to the merchandise.  ECF No. 64-1 at ¶ 68.

The same day, July 6, 2018, Dickey contacted his manager, Evans, who partnered Dickey with a corporate investigator, Brooke Olivieri, to investigate the possible theft of merchandise by Carmon.  Only Dickey, Evans, and Olivieri were involved in the investigation of Carmon's alleged theft.  Their investigation concluded that Carmon had removed merchandise from the Frontenac store on June 4, 2018 and on June 27, 2018, without apparent authority to do so.  ECF No. 64-1 at ¶ 69.  However, as noted above, Saks later realized, and it is undisputed, that Dickey authorized Carmon to remove and donate at least some merchandise on June 4, 2018.

18

On July 10, 2018, Carmon returned from her vacation.  That day, she brought over

$12,000 of Saks merchandise into the store from her car, along with a blank donation

receipt form.  *Id.* at ¶ 71.  The merchandise included the items that Detective Barron had

returned to the Frontenac store on June 27th and the items that Dickey authorized

Carmon to donate on June 4th.  ECF No. 74, PSUMF at ¶ 257.  Dickey and Hawley

interviewed Carmon the same day (July 10th), and Carmon stated that she took the

merchandise to donate, believing that the merchandise from Detective Barron was "like

COM merchandise."  *Id.*, PSUMF at ¶ 279.  During this interview, Dickey suggested to

Carmon that he believed Carmon took the merchandise to donate it rather than to enrich

herself.  *Id.*, PSUMF at ¶ 260.

The same day, Dickey and Hawley informed Detective Barron of Saks' decision to

seek criminal charges against Carmon.  Detective Barron then placed Carmon under

arrest for outstanding traffic warrants, took her to the police station, and at the police

station informed her that he was referring her case to the prosecutor for felony theft

charges.  ECF No. 54-4, Barron dep. 87:10-16.  Detective Barron believed he had

probable cause to arrest Carmon for the crime of stealing based on the information

Dickey and Saks provided to him.  *Id.* at 51:10-52:10, 140:3-21.  However, Detective

Barron could not recall if Dickey informed him that the bags of merchandise Carmon

returned to the store on July 10, 2018 contained a blank donation form, and Detective

Barron did not mention the presence of a donation form in his police incident report.

ECF No. 74, PSUMF at ¶¶ 231-232.  Detective Barron was also unaware that Carmon

was maintaining that she had donated items in the past without following any specific policy for such donation. *Id.* at ¶ 234

On July 12, 2018, Carmon sent a written complaint to Noland and Evans, alleging that Dickey had framed her and requesting an investigation. ECF No. 64-1 at ¶ 76. In the letter, Carmon informed Noland and Evans that she had been directed to donate Saks merchandise in the past for one of three reasons: (1) COM that was still present after the hold policy expired, (2) merchandise that was no longer in the system, and (3) merchandise that Saks could no longer account where it originated from. *Id.* ¶ 77. In support of this complaint, Carmon attached an audio recording of her June 4, 2018 conversation with Dickey in which Dickey instructed her to take and donate three COM items. *Id.* at ¶ 78.

In response to Carmon's complaint, Noland initiated an investigation. On or about July 17, 2018, Noland spoke with Carmon by phone to follow up on Carmon's complaint. Carmon at that time asked Noland whether she was being fired because she had seen that her position at Saks was posted. Noland told Carmon that she was not being fired but that she still needed to answer the follow-up questions regarding her complaint. ECF No. 64-1 at ¶ 79; ECF No. 54-42, Pl.'s Ex. 66.

Following her phone call with Carmon, Noland inquired about the job posting and learned that Hawley had posted the position without Noland's knowledge to start the process of finding a replacement in case Carmon did not return. ECF No. 54-42, Pl.'s Ex. 66. Noland acknowledged that it was poor timing for Hawley to post Carmon's

position before Saks completed its investigation into Carmon's alleged theft.  ECF No. 74, PSUMF at ¶ 294.

Based on the results of the entire investigation, and in consultation with Saks' legal department, Noland and Hawley made the decision to terminate Carmon's employment, effective July 19, 2018.  The parties dispute whether Dickey was also involved in this decision.  ECF No. 64-1 at ¶ 82.

The July 19, 2018 termination letter Saks sent to Carmon stated that her termination was the result of the following: "You were placed on a final warning 3/29/2018.  Your employment is being terminated for violation of policy."  ECF No. 54-27.  According to Saks, the only policy Carmon violated was taking merchandise from the Frontenac store that was not paid for and that she did not have authorization to take; the violation of this policy is Saks' sole reason for terminating Carmon.  ECF No. 74, PSUMF at ¶¶ 307-08.

Saks' corporate representative in this case testified that if an employee had intent to deprive the company of property, Saks would pursue termination or prosecution of the employee.  But if there was no intent to deprive Saks of the property, the matter would be reviewed by human resources and may or may not include termination.  ECF No. 54-12, Kilgallon dep. 55:5-56:9.  The corporate representative further testified that if Carmon was following the direction of her supervisor to donate the items, she should not have been terminated by Saks or arrested.  *Id.*, Kilgallon dep. 56:13-57:1.

In July of 2018, Dickey arranged to have Darrell Jackson, an African American male, hired to replace Carmon.  ECF No. 64-1 at ¶ 83.

21

**Carmon's August 7, 2018 Administrative Charge and Subsequent Lawsuit**

On August 7, 2018, Carmon dual-filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Missouri Human Rights Commission ("MHRC") alleging violations of the MHRA arising from her employment with Saks.  ECF No. 64-1 at ¶ 85.

On August 9, 2018, the Circuit Court of St. Louis County issued a warrant for Carmon's arrest on one count of felony stealing arising from her taking of merchandise from Saks.  *Id.* at ¶ 84.  However, the charges were ultimately dismissed by the court for failure to prosecute because Saks witnesses failed to show up for Carmon's preliminary hearing.  ECF No. 74, PSUMF at ¶ 328.

Since 2015, there have been at least two other instances of alleged theft involving employees at Saks' Frontenac store.  ECF No. 54-12, Kilgallon dep. 59:14-24.  The record does not disclose the race of the employees, the details of the theft in either instance, or whether either involved theft of merchandise.  Both employees were terminated, but Saks' corporate representative did not know whether police were contacted in either instance or whether either employee was arrested.  *Id.* at 59:14-62:21.

When asked during her deposition if she was aware of any white employees in asset protection who were treated differently than her with respect to the disciplinary action given by Dickey, Carmon responded, "I don't know."  ECF No. 54-8, Carmon dep. 353:15-19.

On June 7, 2019, Carmon filed suit in state court.  Saks removed the case to this Court on October 21, 2019, properly invoking the Court's diversity jurisdiction.  Carmon

22

asserts three claims against Saks: (1) race discrimination in violation of the MHRA, based on the denial of promotions, discipline for false and pretextual reasons, false accusation of stealing, false arrest, and termination; (2) race discrimination – hostile work environment in violation of the MHRA, based on all of the allegations in her complaint; and (3) retaliation in violation of the MHRA, based on her complaints to human resources in April and May of 2018 and subsequent arrest and termination.

## **ARGUMENTS OF THE PARTIES**

In support of its motion for summary judgment and in opposition to Carmon's motion, Saks argues that, to the extent Carmon's claims are based on any action taken before February 8, 2018—180 days before she filed her administrative charge of discrimination—Carmon's complaints are time-barred.  Saks maintains that the only timely acts of discrimination alleged by Carmon are her March 2018 discipline and her July 2018 termination, neither of which is sufficiently similar in nature, frequency, or severity to the prior alleged acts of discrimination as to constitute a continuing violation.

In any event, Saks argues that Carmon has failed to establish a prima facie claim of discrimination or retaliation based on any of Saks' alleged conduct and also cannot survive scrutiny under the burden-shifting analysis set forth by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As to Carmon's hostile work environment and race discrimination claims, Saks argues: (1) the conduct complained of was not severe or pervasive enough to establish a hostile work environment, (2) Carmon was not qualified for the promotions for which she applied, (3) the white individuals promoted over her were not similarly situated to her, (4) Carmon's final written warning and negative

23

performance evaluation in March 2018 were not adverse employment actions under the MHRA, (5) Carmon's race was not the motivating factor for Saks' decision to terminate her, and (6) in any event, Carmon cannot establish that Saks' legitimate non-discriminatory reasons for disciplining and terminating her were pretext for race discrimination.

As to Carmon's retaliation claim, Saks argues that Carmon cannot establish causation because her written warning and performance evaluation were not related to any protected activity by Carmon, and aside from temporal proximity, there is no evidence that Carmon's July 2018 termination was causally connected to her April 2018 complaint to human resources.  Moreover, as with Carmon's discrimination claims, Saks argues that Carmon cannot establish that its legitimate reasons for disciplining and terminating her were pretext for unlawful retaliation.

In response, and in support of her cross motion for summary judgment, Carmon argues that the doctrines of equitable estoppel and continuing violation save her claims from any statute-of-limitations defense.  Specifically, Carmon argues that because "the racially-charged environment at Saks let up for approximately 180 days and then hit the pedal hard on retaliation on multiple employees shortly thereafter, this Court should find the 180-day statute of limitations tolled as to the anonymous letter" under the doctrine of equitable estoppel.  ECF No. 64 at 21.  Alternatively, Carmon argues that Saks' alleged conduct over the entire relevant time period is part of a continuing violation connecting the events before the 180-day deadline to those after.

Regarding the merits of her claims, Carmon argues that her hostile work environment and race discrimination claims not only survive Saks' motion for summary judgment but also merit judgment as a matter of law in Carmon's favor.  Carmon contends: (1) she has offered direct evidence of a hostile work environment, including being asked to work at the Veiled Prophet event and being subjected to the conditions described in her July 2017 anonymous letter, (2) she was qualified for the promotions for which she applied, (3) Plufka's, Derrick's, and Dickey's comments to Carmon during the application process demonstrate that race discrimination motivated Saks' decision not to promote Carmon, and (4) Saks' alleged reason for terminating her is pretextual because it is not the same reason stated in her termination letter, other black employees like Sims and black customers were treated differently than their white counterparts, and other employees who were caught stealing were not arrested and thus were treated differently than Carmon.

Likewise, Carmon argues that her retaliation claim survives Saks' summary judgment and also merits judgment as a matter of law in her favor.  Carmon contends that the evidence establishes that Saks issued her a final written warning, gave her a negative performance evaluation, and terminated her, all in retaliation for both her July 2017 anonymous letter[6] and her April 2018 complaint to human resources.  Specifically, Carmon argues that a causal connection is demonstrated by the temporal proximity

---

[6]     Although Carmon's complaint in this case does not reference the July 2017 anonymous letter as a basis for her claim of retaliation, Carmon asserts retaliation based on the letter as part of the current summary judgment motions.

25

between her April 2018 complaint and her July 2018 termination; the March 2018 emails between Dickey, Hawley, and Vasconcellos discussing their desire to terminate Carmon while also indicating a suspicion that Carmon was behind the July 2017 anonymous letter; the lack of any basis for Dickey's complaints about Carmon's performance; the fact that Dickey was made aware of Carmon's complaint against him and Dickey also led Saks' investigation into Carmon's theft; and the circumstances surrounding Carmon's alleged theft, including Saks' lack of a clear donation policy, Carmon's practice of donating merchandise in the past, the blank donation form that Carmon returned along with the merchandise, and Saks' failure to pursue prosecution after Carmon was terminated and arrested.

## DISCUSSION

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must view "the evidence and the inferences which reasonably may be drawn from the evidence in the light most favorable to the nonmoving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

In opposing summary judgment, a plaintiff may not "simply point to allegations" in the complaint, *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," *Matter of Citizens*

*Loan and Sav. Co.*, 621 F.2d 911, 913 (8th Cir. 1980).  Rather, the plaintiff "must identify and provide evidence of specific facts creating a triable controversy."  *Howard*, 363 F.3d at 800 (citation omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

**<u>Timeliness</u>**

The MHRA prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  Mo. Rev. Stat. § 213.055.1.  The MHRA requires the individual to file a complaint with the MCHR within 180 days of the alleged act of discrimination. *Id.* at § 213.075.1.  Applying that statute of limitations here, Carmon's claims for discriminatory acts that occurred prior to February 8, 2018 are time-barred unless the time period for filing was tolled.  *See Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 835 (8th Cir. 2002) (interpreting the MHRA); *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 685 (Mo. 2009).

The MHRA's 180-day filing period is subject to equitable exceptions.  *See Wallingsford*, 287 S.W.3d at 685.  The doctrine of equitable estoppel, asserted by Carmon here, "comes into play when the employee's failure to file in a timely fashion is the consequence of either a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge." *Dorsey*, 278 F.3d at 835 (citations omitted).  The employee must show she

27

was aware of her cause of action and was "lulled or tricked into letting the . . . filing deadline pass because of some employer misconduct." *Id.*

Carmon fails to allege or establish any misconduct by Saks here that lulled her into delay. To the contrary, Carmon asserts that Saks *abstained* from misconduct during the period of delay. Equitable estoppel is thus not a proper basis for tolling the limitations period.

The limitations period is also subject to a "continuing violation exception, which permits a plaintiff to recover for acts of discrimination occurring prior to the 180–day filing period if the discrimination is a series of interrelated events." *Wallingsford*, 287 S.W.3d at 685. "Missouri applies a two-part test to determine if a plaintiff has shown a continuing violation. The plaintiff must first demonstrate that at least one act occurred within the filing period and, second, must show that the harassment is a series of interrelated events, rather than isolated or sporadic acts of discrimination." *Rowe v. Hussmann Corp.*, 381 F.3d 775, 782 (8th Cir. 2004) (citations omitted). "If the plaintiff proves both, the 180–day filing period becomes irrelevant and she may then offer evidence of the entire continuing violation." *Id.* (citations omitted).

Carmon alleges three acts that occurred after February 8, 2018 and thus within the filing period: (1) her March 2018 final written warning and negative performance evaluation, (2) being asked to work the April 2018 Veiled Prophet event,[7] and (3) her July 2018 termination.

---

[7]     As discussed below, no reasonable factfinder could conclude that Carmon's allegations with respect to the Veiled Prophet event constituted discrimination or

None of these acts are sufficiently related to the denial of promotions that took place in 2016 and 2017, as to make Carmon's claims regarding those promotions timely. Indeed, the Eighth Circuit, interpreting the MHRA, has expressly held that "a promotion decision is a discrete act" such that it cannot be saved by the continuing-violation doctrine. *Roach v. Vallen Safety Supply Co.*, 14 F. App'x 711, 712 (8th Cir. 2001); *see also Dorsey*, 278 F.3d at 838–39 (reasoning that because "the decision[] not to promote Appellants was a discrete event completed at the time of the promotions . . . . [t]he promotions are not like or reasonably related to Appellants['] allegations of the harassment that occurred throughout their employment"); *High v. Univ. of Minn.*, 236 F.3d 909, 909 (8th Cir. 2000) (holding with respect to a Title VII claim that "[t]his court has never applied the continuing violations doctrine to a discrete act, such as failure to promote"); *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 255 (Mo. Ct. App. 2012) (adopting federal caselaw holding that discrete acts such as "termination, *failure to promote, denial of transfer,* or refusal to hire" constitute "separate actionable unlawful employment practice which are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*") (emphasis in original) (cleaned up and citations omitted).  Therefore, Carmon is not entitled to relief for the denial of promotions in 2016 and 2017, as those claims are time-barred.

---

contributed to a hostile work environment.  But for the purpose of the timeliness analysis, the Court will presume that the Saks' conduct with respect to the Veiled Prophet event could constitute a timely act that, if sufficiently related to prior acts, could be part of a continuing violation.

As to Carmon's claims regarding the alleged instances of racial harassment described in her anonymous July 2017 letter, the Court is not convinced that the conduct described in that letter is sufficiently related in nature or time-period to Carmon's timely claims regarding the April 2018 Veiled Prophet event or her March 2018 written warning and negative performance evaluation,[8] to be considered part a series of interrelated events.  Nevertheless, in light of the generally cumulative nature of hostile work environment claims,[9] the Court deems it prudent to address the merits of Carmon's claim as it relates to her July 2017 letter rather than to dismiss the claim as untimely.

**Hostile Work Environment**

"A successful claim of a hostile work environment requires the plaintiff to show: (1) she is a member of a group protected under the MHRA; (2) she was subjected to unwelcome harassment; (3) the plaintiff's membership in the protected group was [the motivating][10] factor in the harassment; and (4) a term, condition, or privilege of the

---

[8]     As discussed above, Carmon's July 2018 termination is a discrete event to which the continuing violation doctrine does not apply.

[9]     *See, e.g.*, *Rowe* , 381 F.3d at 782 ((recognizing that under both Missouri and federal law, "a hostile work environment is but a single unlawful employment practice . . . , and it matters not if one or all of the component acts occurred within the limitations period"); *Pollock v. Wetterau Food Distrib. Grp.*, 11 S.W.3d 754, 763 (Mo. Ct. App. 1999) ("As in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and as a practical matter, in its cumulative effect.")

[10]     The parties agree that the MHRA's 2017 amendment, effective August 28, 2017, applies, such that the standard in this case is whether "the employee's protected status was the *motivating factor* in an adverse employment action." *Bram v. AT&T Mobility*

plaintiff's employment was affected by the harassment." *McGaughy v. Laclede Gas Co.*, 604 S.W.3d 730, 748 (Mo. Ct. App. 2020).  Further, "[i]f the alleged harassers are co-workers, the plaintiff must also show that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666, n.6 (Mo. 2009).  "In deciding a case under the MHRA, . . . courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law." *Watson v. Heartland Health Labs., Inc.*, 790 F.3d 856, 861 (8th Cir. 2015) (citing *Daugherty v. City of Md. Heights,* 231 S.W.3d 814, 818 (Mo. 2007)).

"Not all unpleasant conduct creates a hostile work environment.  Rather the plaintiff must show that she was singled out because of her . . . race, and that the conduct was severe and pervasive," *Palesch v. Mo. Comm'n on Hum. Rts.*, 233 F.3d 560, 567 (8th Cir. 2000), "as viewed subjectively by the plaintiff and as viewed objectively by a reasonable person." *McGaughy*, 604 S.W.3d at 748 (citations omitted).  The standard for proving such a claim is "demanding," requiring that harassment to be "so intimidating, offensive, or hostile that it poisoned the work environment, and that the workplace was

---

*Servs., LLC*, 564 S.W.3d 787, 794 (Mo. Ct. App. 2018) (emphasis in original); *see* Mo. Rev. Stat. § 213.010(2) (2017). "This new standard is analogous to the one used in employment discrimination claims under federal law, and imposes a higher burden upon the employee than the prior 'contributing factor' standard." *Bram*, 564 S.W.3d at 794-95. Because "[t]he applicable statute is typically the one in effect when the petition was filed," *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 n.3 (Mo. 2019), and Carmon filed her complaint on June 7, 2019, the Court agrees that the 2017 amendment applies to this case.

permeated with discriminatory intimidation, ridicule, and insult." *Watson*, 790 F.3d at

861 (cleaned up and internal citations omitted).  "When considering the objective

hostility of a work environment, we consider the totality of the circumstances, including

the frequency and severity of the discriminatory conduct, whether such conduct was

physically threatening or humiliating, as opposed to a mere offensive utterance, and

whether the conduct unreasonably interfered with the employee's work performance." *Id.*

at 862 (citations omitted).

The actions complained of here, even when viewed in the light most favorable to

Carmon, fail to satisfy this demanding standard.  As an initial matter, much of Carmon's

hostile work environment claim is based on her assertion that she was actually subjected

to the conditions described by the fictitious store manager in her July 2017 anonymous

letter.  But Carmon has not presented admissible evidence that the race-based derogatory

comments and slurs described in the letter were actually made by any real-life managers,

let alone heard by Carmon.

To the extent that Wells's investigation resulting from the letter provides evidence

of some racially insensitive comments being made by store managers, there is no

indication from the record that these comments were made in Carmon's presence.  Most

of the comments were not about Carmon, and the managers at issue did not supervise

Carmon and were not involved in any decisions regarding her employment.  Moreover,

Saks took prompt remedial action after Wells's investigation by disciplining the

managers at issue.  *See Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir.

2005) (holding that an employee could not establish a hostile work environment claim

32

where he had second-hand information that managers and co-workers referred to him using racial slurs and where the employer took action by demoting one such co-worker); *See also Muhammad v. City of St. Louis*, No. 4:18-CV-1757 RLW, 2020 WL 6939611, at *8 (E.D. Mo. Nov. 25, 2020) (rejecting a hostile work environment claim where the employee "identified no instances where he was personally subjected to an incident of harassment based upon race" but merely described mistreatment of others and racial slurs heard by others).

Likewise, the comments or conduct allegedly directed to Carmon by Dickey and others, alone or in combination, do not constitute objectively severe or pervasive harassment.  For instance, as to Dickey's alleged request that Carmon work the Veiled Prophet event in April 2018,[11] Carmon admits that Dickey excused her from working the event precisely because she expressed discomfort.  No rational jury could find that Carmon's evidence amounted to a hostile work environment.

**Race Discrimination**

After dismissing Carmon's failure-to-promote claims as untimely and her hostile work environment claim as without merit, Carmon's only remaining claims of race discrimination arise from her March 2018 final written warning and negative performance evaluation, and her July 2018 termination.

In order to prevail in a suit for race discrimination under the MHRA, Carmon must demonstrate that (1) she suffered an adverse employment action; (2) her race was a

---

[11]     Carmon also does not explain the basis for her belief that the event implicated race or that the organization was racist.

motivating factor in that adverse action; and (3) she incurred damages as a direct result. *See Bram*, 564 S.W.3d at 796; Mo. Rev. Stat. § 213.010(2) (2017).

"To be considered direct evidence of discrimination, a remark must be by a decisionmaker and show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Button v. Dakota, Minnesota & E. R.R. Corp.*, 963 F.3d 824, 831 (8th Cir. 2020) (citation omitted). "Stray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisional process do not constitute direct evidence." *Id.*

In the absence of direct evidence, the Court looks to the *McDonnell Douglas* burden-shifting framework, Mo. Rev. Stat. § 213.101, which requires that the employee first establish a prima facie case of discrimination, and if she does, the employer is required to articulate a legitimate, non-discriminatory reason for its actions. *E.g.*, *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 808 (8th Cir. 2020). If the employer does so, the employee bears "the ultimate burden to produce evidence sufficient to create a genuine issue of material fact regarding whether [the employer's] explanation is mere pretext for intentional discrimination." *Id.* (internal alterations omitted).

As an initial matter, it is not clear to the Court that the March 2018 final written warning or negative performance evaluation were adverse employment actions. These actions are not alleged to have affected Carmon's pay or duties, and they did not result in her termination, which was instead caused by her alleged theft and violation of policy. *See Watson*, 790 F.3d at 864 (suggesting that "write-ups and extension of [an

34

employee's] probationary period" did not adversely affect the employee where they did not result in lower pay or a change in work hours or duties); *Spears v. Mo. Dep't of Corr. & Hum. Res*., 210 F.3d 850, 854 (8th Cir. 2000) ("A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment . . . [unless] the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.").

But in any event, no reasonable factfinder could conclude that the warning or performance evaluation was racially motivated or, applying *McDonnell-Douglas* burden-shifting, that the stated performance issues were pretext for race discrimination.  Indeed, it is undisputed that Carmon was late in filing required reports.  And she presents no evidence of similarly situated white employees who were treated differently.

Carmon's complaint that she was not adequately informed of these performance issues earlier and her disagreement with the basis for some of the issues may be reasons to question the Frontenac store's business practices, but they do not evidence a discriminatory animus based on race.  *See Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997) (holding that anti-discrimination "statutes do not prohibit employment decisions based upon poor job performance, erroneous evaluations, personal conflicts between employees, or even unsound business practices" but only "serve the narrow purpose of prohibiting discrimination based on certain, discreet classifications such as age, gender, or race");  *Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1077 (8th Cir. 2013) (holding that no inference of discrimination was raised with respect to an employee's negative performance review that was "more exacting" than earlier

35

evaluations where the reviews "reiterated the problems that had been previously identified" by the employer and where the employee had not shown earlier racist remarks by her supervisor were related to the decision to issue the employee a written warning).

Likewise, no reasonable factfinder could conclude from this record that Carmon's July 2018 termination was racially motivated or that Saks' stated reason for the termination was pretext for race discrimination.  As Carmon notes, an employer's substantial shift over time as to the proffered reason for an employment decision can support a finding of pretext.  *See Button*, 963 F.3d at 833-34.  But contrary to Carmon's assertion, Saks did not change its reason for terminating her.  Carmon's final termination letter referenced her violation of policy, and her taking of non-COM merchandise from the store without authorization was indeed a violation of Saks' policy.  *See id.* at 834 (holding that an employer's "elaboration" on reasons previously given for terminating an employee did not evidence a such a substantial shift in explanation as to create an inference of discrimination).

A showing that an employer's explanation for an employment decision is "unworthy of credence" can also support a finding of pretext.  *See, e.g.*, *Main v. Ozark Health, Inc.*, 959 F.3d 319, 324 (8th Cir. 2020).  But that requires "showing that the employer did not truly believe the employee engaged in the conduct justifying termination," not merely a "showing that the employer's 'honest' belief was erroneous, unwise, or even unfair."  *Id.* at 325.

It is undisputed that Carmon did not have permission to donate the particular items of merchandise returned by Detective Barron on June 27, 2018, regardless of whether

36

Carmon had permission to donate other items in the past.  Indeed, Detective Barron expressly informed Carmon when he returned the merchandise that Saks intended to retain it.  Carmon's lack of authority to take the items out of the store, in combination with other evidence, such as Saks' inability to locate the property release form signed by Carmon and evidence that a security camera that Carmon had access to had been moved—even if inconclusive as to whether Carmon committed the crime of theft— supports Saks' honest belief that Carmon violated Saks' policy.  *See Palesch*, 233 F.3d at 569 ("The two explanations offered by the Commission for Palesch's termination combined with the lack of any real evidence that any adverse action taken toward Palesch was motivated by discriminatory animus entitled defendants to summary judgment.").

Nor has Carmon identified similarly situated white employees who were treated differently by Saks.  "The test for whether employees are 'similarly situated' to warrant a comparison to a plaintiff is a 'rigorous' one."  *Id.* at 568 (citations omitted).  "For discriminatory discipline claims, employees are similarly situated when they are involved in or accused of the same offense and are disciplined in different ways."  *Id.* (citations omitted); *see also Muor*, 716 F.3d at 1078 ("[T]he employees used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") (citation omitted).

Carmon admittedly does not know of any white employees in asset protection who were treated differently with respect to the disciplinary action given by Dickey.  The two other employee-theft instances identified by Carmon cannot constitute "similarly-

37

situated" evidence because Carmon has provided no evidence as to the race of these employees, the department in which they worked, the type of theft involved or whether it included Saks merchandise, the amount of theft involved, or the circumstances surrounding the alleged theft.  In any event, it is undisputed that both of those employees were terminated.  The record does not disclose whether criminal charges were pursued by Saks in those instances.  But even if they were not, that fact is irrelevant because, again, the Court has no information to compare the similarity of the two employees to Carmon.

Finally, to the extent that Carmon attempts to rely on Saks' treatment of another African American employee, Sims, to illustrate Saks' discriminatory motive, Carmon's attempt fails.  "Missouri courts have recognized that so-called 'me too' evidence of other discrimination victims is relevant where the plaintiff shows that he and others were treated similarly by being disciplined or fired and that the dominant common factor between himself and the others who were disciplined or fired is their membership in the protected group."  *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1035 (8th Cir. 2016).

Carmon's "me too" evidence regarding Saks' treatment of Sims fails to give rise to a genuine issue of material fact.  There is simply no admissible evidence to support Carmon's assertion that Sims was treated similarly to Carmon or that race played any role in Saks' decision to eliminate Sims's part-time position.

"The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  *Palesch*, 233 F.3d at 568–69 (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133 (2000)).  "There is insufficient evidence in this case to

38

permit a finding of intentional discrimination with respect to any of the numerous theories espoused by [Carmon]." *See id.* at 569.

## Retaliation

"To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action." *Denn*, 816 F.3d at 1036. "With respect to the third element, Missouri courts have recognized that a 'causal relationship' exists when retaliation was the "[motivating] factor to the adverse action." *Id.* (discussing then-existing statute); *see also* Mo. Rev. Stat. § 213.010(2) (2017); *Bram*, 564 S.W.3d at 794-95 (discussing the new "motivating factor" standard).

Carmon has failed to demonstrate a genuine issue of material fact with respect to her claim that her March 2018 written warning and negative performance evaluation and/or her July 2018 termination constituted unlawful retaliation for her July 2017 anonymous letter[12] and/or her April 2018 complaint to human resources regarding Dickey.

As to Carmon's March 2018 written warning and negative performance evaluation, as noted above, it is unclear that either constituted an adverse action. But

---

[12]   The Court will assume, without deciding, that Carmon's July 2017 anonymous letter constituted protected activity for the purpose of an MHRA retaliation claim. Although Saks did not know that Carmon authored the letter at the time, the record supports an inference that Saks suspected Carmon's involvement by February of 2018 or earlier.

more importantly, Carmon cannot demonstrate a causal connection between these actions and either of her alleged protected activities.

Carmon's March 2018 warning and performance evaluation pre-dated her April 2018 complaint to human resources, so the warning and evaluation could not have been motivated by that complaint.[13]   The warning and review also came nearly a year after Carmon delivered her July 2017 anonymous letter.  "As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternate evidence of causation." *Tyler v. Univ. of Ark. Bd. of Trs.,* 628 F.3d 980, 986 (8th Cir.2011).

To show causation, Carmon relies heavily on the March 2018 emails in which Dickey, Hawley, and Vasconcellos discussed Carmon's performance issues and desire to replace Carmon while also referencing Dickey's suspicion that Carmon may have been behind the July 2017 anonymous letter.  But no rational factfinder could conclude from those emails or the record as a whole that Saks fabricated performance issues for purpose of retaliating against Carmon for *possibly* drafting an anonymous letter almost a year earlier.[14]

---

[13]     Indeed, the fact that Carmon complained about Dickey so shortly after receiving a written warning and poor review weighs against her claims. *See, e.g.*, *Hervey v. Cnty. of Koochiching,* 527 F.3d 711, 723 (8th Cir. 2008) ("Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action.").

[14]     Notably, if Saks personnel suspected Carmon possibly drafted the July 2017 letter, they also would have believed it contained at least one false statement, as Carmon was not a manager.

40

Rather, as discussed above, the record supports that Saks' non-pretextual reason for issuing the warning and review was Carmon's performance issues, including her undisputed failure to provide timely reports.  Indeed, the person who expressed the desire to terminate Carmon in the March 2018 emails, Hawley, was not even employed by Saks at time Carmon sent her anonymous July 2017 letter.  And as noted above, Carmon's belief that her performance issues were overstated does not evidence that Saks was motivated by retaliation.

Neither has Carmon demonstrated a causal connection between her alleged protected activity and her July 2018 termination.  An entire year separated Carmon's July 2017 anonymous letter and her eventual firing.  That gap in time is too long to support causation for a retaliation claim without additional evidence.  *See Tyler,* 628 F.3d at 986; *Denn*, 816 F.3d at 1036–37 (finding a seven-week gap too long); *McKey v. U.S. Bank Nat'l Ass'n*, 978 F.3d 594, 601–02 (8th Cir. 2020) (four-month span was too long).

The three-month gap between Carmon's April 2018 complaint to human resources and her July 2018 termination is shorter but likely still too long to demonstrate a causal relationship.  *See Denn*, 816 F.3d at 1036–37.  In any event, "[m]ore than a temporal connection between an employee's protected conduct and the adverse employment action is required to create a genuine factual issue on causation."  *Watson*, 790 F.3d at 865.

In the months between Carmon's complaint about Dickey and her termination, Dickey commended Carmon's work and expressed to a human resources manager that Carmon "may turn it all around."  It was only after Carmon took merchandise from the store without permission that Saks decided to terminate her.  Dickey's involvement in the

investigation, without more, does not change the Court's analysis.  Dickey was not the

sole decision-maker with respect to either the investigation or Carmon's termination.

Those decisions were made by multiple supervisors, including Evans, Olivieri, Noland,

Hawley, and Saks' legal department, none of whom was mentioned in Carmon's April

2018 complaint.

　　　　As with Carmon's discrimination claim, no rational jury could draw an inference

from the facts presented here that Saks was motivated by retaliation when it fired Carmon

or that Saks' stated reason for firing her was pretext for retaliation.  *See Musolf v. J.C.*

*Penney Co., Inc.*, 773 F.3d 916, 919 (8th Cir. 2014) (finding that the evidence did not

give rise to an inference of retaliation where in the seven months between the employee's

complaint and termination, she was praised for her work, and it was only after her

supervisor learned that she accessed confidential documents and attempted to break into a

manager's office that he recommended firing her).

　　　　Finally, the "me too" evidence offered by Carmon—in this case, regarding Weis, a

white employee who quit her job after being denied paid time off nearly a year after

participating in Wells's investigation of racism at the Frontenac store—is just as

irrelevant to her retaliation claim as it is to her discrimination claim.  There is simply no

evidence that Weis was constructively discharged or that she was denied paid time off in

retaliation for her participation in Wells's investigation.  Carmon's retaliation claim fails

as a matter of law.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion for summary judgment is

**GRANTED**.  ECF No. 49.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is

**DENIED**.  ECF No. 52.

All claims against all parties having been resolved, a separate Judgment shall

accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE


Dated this 8th day of April, 2021.